| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1**<br>**PORZIO, BROMBERG & NEWMAN, P.C.**<br>100 Southgate Parkway<br>P.O. Box 1997<br>Morristown, New Jersey 07962<br>(973) 538-4006<br>(973) 538-5146 Facsimile<br>Warren J. Martin Jr., Esq. (wjmartin@pbnlaw.com)<br>Kelly D. Curtin, Esq. (kdcurtin@pbnlaw.com)<br>Rachel A. Parisi, Esq. (raparisi@pbnlaw.com)<br>*Proposed Counsel to Debtors* | |
| In Re:<br><br>Garces Restaurant Group, Inc., d/b/a Garces Group, *et al.*,[1]<br><br>        Debtors. | Case No.: 18-19054 (JNP)<br><br>(Joint Administration Pending)<br><br>Chapter: 11<br><br>**Hearing Date and Time:**<br>**May 3, 2018, at 2:00 p.m.** |

## AFFIDAVIT OF JOSE GARCES IN SUPPORT OF DEBTORS' CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Jose Garces, a full age, being duly sworn upon his oath deposes and says:

1.  I am the chief executive officer, as well as either a 100% owner, or a substantial majority owner, of each of the seventeen (17) Debtor entities who filed the within Chapter 11 bankruptcy petitions on May 2, 2018. I am the president and sole shareholder of the corporate debtor, Garces Restaurant Group, Inc., d/b/a Garces Group, and the managing member of each of the other debtors, all of whom are LLC Debtors.

2.  I submit this affidavit on behalf of each of the Debtors in connection with their

---

[1] The Debtors in these Chapter 11 Cases (joint administration pending) and the last four digits of their employee identification numbers are: GRGAC1, LLC d/b/a Amada (7047); GRGAC2, LLC d/b/a Village Whiskey (7079); GRGAC3, LLC d/b/a Distrito Cantina (7109); GRGAC4, LLC (0542); Garces Restaurant Group, Inc. d/b/a Garces Group (0697); Latin Valley 2130, LLC; La Casa Culinary, LLC d/b/a Amada Restaurant (4127); Garces Catering 300, LLC d/b/a Garces Catering (3791); Latin Quarter Concepts, LLC d/b/a Tinto d/b/a Village Whiskey (0067); UrbanFarm, LLC d/b/a JG Domestic (3014); GR300, LLC d/b/a Volver (0347); GRG2401, LLC (7222); GRGChubb1, LLC (8350); GRGFC1, LLC (2040); GRGKC1, LLC; GRGWildwood, LLC (9683); and GRGNY2, LLC (0475).

bankruptcy filings.  I have personal knowledge of the facts set forth herein.

## I.    BACKGROUND

### A.    About Me

3.    I was born and raised in Chicago, the son of Ecuadorian immigrants.  I opened my first restaurant in 2005 (Amada, PA), with flavors patterned after my grandmother's home cooking.  That restaurant was followed by a string of successful endeavors, and, of course, a few unfortunate failures.

4.    As to my culinary "chops," I am the 2009 winner of the James Beard award: "Best Chef, Mid-Atlantic."  I am one of eight chefs who hold the Food Network title, "Iron Chef."  I've authored two cookbooks: The Latin Road Home (Lake Isle Press, October 2012), and Latin Evolution (Lake Isle Press, Fall 2008).  A list of culinary accomplishments and recognitions is attached as **Exhibit A**.

### B.    An Overview of the Garces Group Enterprise

5.    Since we opened our first restaurant in 2005, the Garces Group has grown to over $40 million in revenues.  During this time, I have consistently reinvested operating profits back into the business units.  A schedule showing the dates of opening our various concepts, as well as the dates of closure of certain restaurants and concepts, is annexed hereto as **Exhibit B.**

6.    The Debtors operate in three business segments: catering, managed services, and owned restaurants.  I own 100% of each of the catering and managed services debtors, and with respect to the five (5) owned restaurant Debtors (six (6) restaurants), I maintain the following ownership percentages:  La Casa Culinary, dba Amada (66%); Latin Quarter Concepts, (two restaurant dbas: Tinto and Village Whiskey (70%)); GR300, LLC dba Volver (100%) and GRGFC1, LLC dba Buena Onda (97.04%).

7.    The entire organization currently employs about 750 people.  Most of our general

2

managers started in hourly or mid-level manager positions and were promoted from within. Similarly, the vast majority of our Chefs de Cuisine were internally promoted, and 60% of Senior Leadership team came to corporate via internal promotions from restaurant manager or Chefs de Cuisine positions.  I am proud of our employees and the opportunities created for them within the Garces Group organization.  Our management organizational chart is annexed hereto as **Exhibit C**.

C.      **Garces Catering 300, LLC**

8.      Debtor Garces Catering, a.k.a Garces Events, is 100% owned by me.  Garces Events is a full-service catering division hosting and providing restaurant quality fare annually for over 1,500 events.  Garces Events is Philadelphia's premier catering company and the exclusive caterer for the Kimmel Center for the Performing Arts, the Academy of Music, the Cira Centre, and the Philadelphia 76ers Training Complex.  We are the "official catering partner" of the Philadelphia 76ers.  Our major accounts include universities such as the University of Pennsylvania (graduation events) and the Wharton School (alumni weekend), plus corporations and foundations including Google, Twitter, Comcast, Susan G. Komen Foundation, The Philadelphia Eagles, American Express, Subaru and Goldman Sachs.  We also cater weddings and social events.  Some 140 weddings per year alone bring in over $2.0 million of Garces Events' sales.

9.      In 2012, we took over as the exclusive caterer for The Kimmel Center.  The Kimmel Center is a state of the art performing arts venue with multiple, of what was then underused, meeting rooms and event spaces.  At the time Garces Events stepped in, the Center had $2.0 million in annual food and beverage sales.  Now, it realizes over $10.0 million in annual revenue through concessions and both on-site and off-site catering.  We work closely

3

with the Kimmel Center's resident companies, such as the Philadelphia Orchestra and Opera Philadelphia, catering their annual galas.   We also cater The Academy Ball, an exciting Philadelphia tradition.

10.   Garces Events also operates a concessions division providing food services to Delaware River Waterfront Commission's popular Spruce Street Harbor Park and Winterfest activities, generating over $1.3 million in annual sales.   Garces Events served at the 2017 NFL Draft as a concessionaire.

11.   In 2016, Garces Events saw a $1.2 million improvement in food and beverage revenue and an increase of $806,000 in net operating income ending 2016 with NOI margin of 13.8%.   In 2014, 2015 and 2016 combined, aggregate profits generated by Garces Events exceeded $2.4 million.   Due to the closing of the Revel restaurants and other setbacks described below, I withdrew none of those profits; instead requiring that that cash stay within the organization to support the Restaurant Group, as needed during the difficult times I will describe below.

**D.**   **Managed Services**

12.   The Managed Services business segment evolved from the owned restaurant efforts.   Managed Services involves working under contract with a third-party owner, such as a Casino, and, creating for that owner the concept, space, and the food and beverage menu, as well as hiring and training staff, among other things.   In the Managed Services business segment, we lend our name, our expertise, and our creative flair to a third-party owner, without taking on (ourselves) any of the economic obligations for rent, build out, debt, food purchases, or labor expenses.   Debtor Garces Group Restaurant, Inc. typically manages such restaurants under a contract which is memorialized in a Restaurant Management Agreement ("RMA").   The RMA

4

3933147

contracts are housed in Debtors like GRGAC4 (Tropicana), GRGChubb1 (the Ace Conference Center) and GRGWildwood, LLC (Morey's Piers).  A typical RMA agreement will include an upfront development fee for our work in planning, design, hiring, etc., and once the venue is open, a commission type fee to the Garces Group based upon percentage of gross sales, a performance fee, a flat fee/guaranteed minimum, or some percentage of the above.[2]

13.     Although the historical practice has been to house each RMA contract in a separate legal entity, each of these entities is 100% owned by me.  The following three Debtors herein operate in the Managed Services division of the business, pursuant to RMAs or similar agreements: GRGAC4, GRGChubb1, GRG2401, GRGNY2, and GRGWildwood.

**E.      Owned Restaurants**

14.     Over a dozen years the Garces Group has assembled a portfolio of award-winning owned restaurants.  While we have opened one or two restaurants per year, we have also reworked styles, retired concepts, and closed restaurants that have not achieved financial benchmarks.  The owned restaurant Debtors are: La Casa Culinary, which owns Amada restaurant in Philadelphia, Latin Quarter Concepts, which owns Tinto and Village Whiskey restaurants, also in Center City Philadelphia, GRGAC1, GRGAC2, and GRGAC3, which owned the four restaurants at the Revel Casino, Atlantic City, which are now closed as further described *infra*, GRGFC1 which owns Buena Onda in Philadelphia, and GR300, which owns Volver restaurant, also in Philadelphia.  Our owned restaurants are popular, with approximately half of

---

[2] In a recent May 2018 article in Philly Mag, copy annexed hereto as **Exhibit D**, a number of Garces Group restaurant closures over the last few years were highlighted: Mercat a la Planxa (Chicago), Rural Society (Chicago), Rural Society (Washington, D.C.), Old Town Whiskey (Scottsdale), Distrito (Scottsdale), Tinto (Palm Springs), El Jefe bar (Palm Springs), Amada, New York, Chifa/Rosa Blanca (Philly) and Buena Onda (King of Prussia Mall). (Exhibit D, pages 5-6).  While I've had restaurant failures as described *infra*, *e.g.*, Amada, New York, I note that many of the above cases except for the last three were RMA concepts where the contract with the owner simply came to an end.  These restaurants "closed" to enable the owners to change concepts, as is their prerogative with their owned properties.

our reservations coming from repeat guests.

15.     The three business divisions -- Catering, Managed Services and Owned Restaurants -- have an interdependent and symbiotic relationship.  The successes of the owned restaurants and our patrons' love for the food, have created the love of the brand.  The love for the brand, in turn, creates the opportunities for the Managed Services division to enter into RMA deals with third-party owners.  That branding and name recognition similarly play an important role which supports the Catering business.

16.     The restaurants similarly have a symbiotic relationship with each other.  For example, within one of our Philadelphia restaurant premises, *i.e.*, The Olde Bar,[3] we run a kitchen that prepares certain food items in advance for some of the Garces owned and managed restaurants operating in the greater Philadelphia area.  Further, at our corporate headquarters, we maintain our "test" kitchen and development facility.  I meet there regularly with my chefs and culinary team to develop new dishes, concepts, and experiences for the guests, ensuring that each restaurant maintains the culinary integrity our guests expect when dining at a Garces restaurant.

**F.      Latin Valley 2130, LLC and Garces Restaurant Group, Inc.**

17.     Debtor Latin Valley 2130, LLC is the entity within the Garces Group organization that houses all of the trademarks and tradenames such as Amada, Tinto, Village Whiskey, Garces Trading Company, JG Domestic, Buena Onda, Distrito, and many more.  Obviously, Latin Valley 2130 is critical to the operation of the entire enterprise, since without its cooperation, the restaurants could not operate with their current brand names and associated excellent reputations.

18.     Garces Restaurant Group, Inc. is the home office management company, essentially managing and supervising all operations throughout the entire Garces Group of

---

[3] The Olde Bar is not a Debtor herein.

restaurants, managed services, and catering.  All senior level employees are housed within

Garces Restaurant Group, including the entire accounting function, cash management activities,

and the like.  Importantly, Garces Restaurant Group, Inc. also manages cash that does not belong

to it for others, such as Distrito PA, where I am a minority member.[4]

**G.**    **Garces Foundation**

19.    Although it is not a Debtor in these cases, in a case where brand is important, it

bears mentioning: the Garces Foundation is a 501(c)(3) nonprofit established in 2012, which is

committed to ensuring that Philadelphia's underserved immigrant population has access to

healthcare and educational services.

20.    The Garces Foundation partners with organizations supporting the immigrant

community to connect constituents with needed services.  The organization's goal is to see that

Philadelphia's immigrants have access to the care and education they need so that they may

actively contribute their talents to making Philadelphia truly world-class.

21.    Our annual foundation ball was recently held on April 13, 2018.  We brought

together more than 40 Philadelphia Chefs from all different restaurants (my competitors) who

were happy to lend their time and talents to the cause, preparing a tasting menu for our guests

who helped us raise 25% more for the charity that evening, than we had raised last year.

**II.    HISTORY OF FINANCIAL CHALLENGES AND
OUT OF COURT RESTRUCTURING EFFORTS**

22.    Between April, 2012 and September, 2014, the Garces Restaurant Group operated

four successful dining concepts (owned restaurants) at the Revel Casino in Atlantic City under

the Debtor LLC's GRGAC1, GRGAC2, and GRGAC3.  The Revel restaurants included Amada

AC, Distrito AC, Village Whiskey AC, and Yuboka, a quick service noodle bar.  Following

---

[4] La Cuidad, LLC ("Distrito PA") is not a Debtor herein.

3933147

Revel's first prepackaged bankruptcy filing in 2013, Revel remained a huge success for the Garces Group delivering some $13.4 million in gross revenue, and netting $2.2 million in EBITDA to our bottom line, on an annualized basis.

23.     Revel's second bankruptcy proceeding, however, in as many years (filed on June 20, 2014) resulted in its complete closure on September 2, 2014, literally locking our successful businesses out of the premises. For the last 3 ½ years, the Garces Group has had to carry on with $13.4 million less in  revenues at the top line, and more importantly, $2.2 million less at the bottom line – honestly a massive hit to a $40 million per year business.

24.     From a "learn your lesson" perspective, however, it became clear to me through our ensuing workout efforts, that our successes at Revel (like our earlier successes at Amada and Tinto Pa.) had masked weaknesses in certain other restaurants and in our operations.  Once those Revel revenues evaporated, those weaknesses came to the forefront.  Those weaknesses and the fixes are described *infra.*

25.     In an effort to replicate Revel's successes, in 2015 we built out our first NYC restaurant – Amada New York, in lower Manhattan.  Essentially, having lost the Revel Casino gamble by its closure, we doubled down and along with other investors including Jim Sorkin and Tom Spinner, decided to bet on our own ability to succeed once again in a new and unfamiliar city – New York.

26.     Amada New York cost $5.5 million to build out and fit up, including construction overruns of $1.3 million.  We did not have this capital on hand and thus we borrowed from M&T and others and funded it through our own operations.  Further, once Amada New York opened in April 2016, its high monthly overhead resulted in recurring operating losses that strained the liquidity of the entire Garces Group.  Ultimately, we simply could not sustain Amada New York,

and after a couple of negotiated landlord rent concessions, and some efforts to retool the concept, we closed Amada, New York in March 2018, just two years from opening.  The operations there never turned a profit.[5]

## A.    CAPITAL STRUCTURE

*The Loans*

27.    The Garces Group suffers under the weight of some $7.5 million of bank debt, and each of these Debtors is jointly and severally liable for same.

28.    Pursuant to a Credit Agreement, dated June 27, 2014 (as amended, the "Credit Agreement"), by and among M&T Bank, ("M&T" or the "Bank"), the Debtors[6] and other Garces Group entities, M&T made available to the Debtors certain credit facilities comprised of (i) a term loan in the original principal amount of $4,000,000 (the "Term Loan") and a development loan in the maximum principal amount of $4,500,000 (the "Development Loan") (the Term Loan and the Development Loan are referred to herein each as a "Loan" and together as the "Loans").

29.    The Debtors' obligations to the Bank under the Term Loan are evidenced by that certain Term Note, dated June 27, 2014, in the original principal amount of $4,000,000, as amended and restated by that certain Amended and Restated Term Note, dated August 8, 2014 (as amended, the "Term Note").

30.    The Debtors' obligations to the Bank under the Development Loan are evidenced by (1) that certain Term Note (Development Line Loan 1st Draw)) dated June 21, 2014, in the principal amount of $300,000, (2) that certain Term Note (Development Line Loan 2nd Draw), dated September 24, 2014 in the principal amount of $150,000, (3) that certain Term Note

---

[5] Amada New York is not a Debtor herein.
[6] La Casa Culinary, LLC and Latin Quarter Concepts, LLC were original borrowers under the Credit Agreement, and GRGAC4, LLC was added as an additional borrower under the June 23, 2017 Forbearance Agreement as further described herein.

3933147

(Development Line Loan 3rd Draw), dated October 3 2014 in the principal amount of $650 000,

(4) that certain Term Note (Development Line Loan 4th Draw), dated October 3 2014, in. the

principal amount of $700,000, (5) that certain Term Note (Development Line Loan 5th Draw),

dated August 3, 2015 in the principal amount of $2,000,000, (6) that certain Term Note

(Development Line Loan 6th Draw), dated December 4, 2015, in the principal amount of

$250,000 and (7) that certain Term Note (Development Line Loan 7th Draw), dated March 21,

2016, in the principal amount of $300,000 (collectively, as amended, the "Development Note").

31.    Early restaurant investors Thomas Spinner (Spinner Family Holdings) and James

Sorkin (who invested in Debtors La Casa and Latin Quarter, among other Garces Group

restaurants), received direct closing disbursements from M&T under the Term Loan in the

amount of $689,425.19 and $55,412.68, respectively, in connection with their execution of

consents to the M&T Loans and liens in accordance with the Debtors' respective operating

agreements.[7]   Both also invested (Spinner heavily) in Amada, New York.   The  Spinner and

Sorkin consents to the M&T Loans, among other things, evidenced their recognition of the

Garces Group as an enterprise, since the M&T obligations were spread among all Garces Group

entities, for the benefit of the whole.

32.    The Debtors' obligations to the Bank under the Loans are secured by, among other

things, a lien and security interest in substantially all of the Debtors' assets pursuant to that

certain General Security Agreement, dated July 27, 2014 (as amended, the "Security

Agreement"), under which the Debtors granted to the Bank a security interest in and to the

"Collateral" as that term is defined therein (the "Collateral"), which includes, without limitation,

---

[7] Spinner and Sorkin earned millions from my work when times were good.  Specifically, each made a $100,000 total equity investment in Debtor La Casa in 2005..  Similarly, Spinner invested $158,000 in Debtor Latin Quarter in 2006 and Sorkin $92,000.  From these two Debtors, and their combined total equity investment of $450,000 Spinner and Sorkin have received combined cash distributions from 2005 through 2012 in excess of $1 million.

3933147

all accounts.  The Bank perfected its interest in the Collateral by inter alia, filing UCC-1 Financing Statements with the Commonwealth of Pennsylvania and States of New Jersey and Delaware.

33.    The Debtors' obligations to the Bank under Loans are also guaranteed by me pursuant to that certain Continuing Guaranty (Personal), dated June 27, 2014 (as amended, the "Guaranty").

34.    The Credit Agreement, the Term Note, the Development Note, the Security Agreement, and the Guaranty, together with all documents, instruments and agreements executed in connection therewith and/or in furtherance thereof, as amended from time to time, are referred to herein, collectively, as the "Original Loan Documents".  As of June 22, 2017, the total principal amount due under the Original Loan Documents is $6,286,790.25.

*The Corporate Card*

35.    In addition to the Loans, the Bank made available to the Debtors' related entity, Garces Restaurant Group, Inc., a corporate charge card account in the maximum principal amount of $500,000 (the "Corporate Card"), pursuant to Agreement for Visa Charge Cards and Card Products, dated September 29, 2014 (the "Corporate Card Agreement").

36.    Initially, Garces Restaurant Group, Inc.'s obligations to the Bank under the Corporate Card were secured solely by a security interest in and lien on all assets of Garces Restaurant Group, Inc., pursuant to that certain Continuing Guaranty dated September 29, 2014 (the "Corporate Card Security Agreement") under which the Debtors granted to the Bank a security interest in and to the "Collateral" as that term is defined therein (the "Collateral").

37.    Garces Restaurant Group, Inc.'s obligations to the Bank under the Corporate Card are also guaranteed by the Guarantor, pursuant to (the "Corporate Card Guaranty").

11

3933147

38.      Pursuant to the Forbearance Agreement with M&T, described below, GRG, Inc's obligations to M&T under the Corporate Card were cross-obligated and cross-collateralized with those of all other borrowers, including the Debtors herein.

39.      The Corporate Card Agreement, the Corporate Card Security Agreement, the Corporate Card Guaranty, together with all agreements, documents and instruments executed in connection therewith are referred to hereinafter, together, as the "Corporate Card Documents." As of June 22, 2017, the total principal amount due under the Corporate Card Documents is $499,681.29.

**B.      M&T WORKOUT**

40.      In December 2016, our senior lender, M&T Bank, owed at the time some $6.8 million, issued a default notice to each of the original borrowers and moved the loan into M&T's special assets department.  Although we had never missed a payment on the M&T Bank debt prior to that date, we were in default of two ratios contained in the Credit Agreement: minimum debt service coverage ratio, and senior funded debt to EBITDA ratio.

41.      As a result, we began meeting with M&T Bank in early 2017, along with recently hired restructuring professionals.  The process of regular meetings and regular reporting brought better financial awareness and an improvement in our financial controls.  The process also caused us collectively (Bank and Borrower) following a lot of acrimony and some old fashioned hard work, to come up with an approach for working out our then $6.8 million secured obligation to M&T.  That "go forward" plan was ultimately reflected in a Forbearance Agreement dated June 23, 2017, a copy of which is annexed hereto as **Exhibit E**.

42.      Pursuant to the Forbearance Agreement, and in return for the bank agreeing to refrain from exercising any of its rights and remedies through December 31, 2017, the original

12

Garces Group borrowers restated and reaffirmed their obligations to M&T, and ten (10) "Additional Borrowers" agreed to sign on as co-obligors on the debt, with the debt to be cross-collateralized and cross-defaulted, not only with the previous borrowers, but also with the assets of the Additional Borrowers.   M&T made it clear that it wanted out of the credit, but the Forbearance Agreement would give the company time, initially through year end 2017, to find either an investor or partner, or another institution to refinance the bank's debt, through a process that would be managed by an investment banker.

43.   The Forbearance Agreement also cross-obligated and cross-defaulted all obligations under the Corporate Card Agreement with all other existing obligations of the Debtors and other Garces Group entities to M&T.

44.   With respect to the original borrowers who were executing the Forbearance Agreement, where I did not own 100% of the member interests, we obtained the consents of the minority partners to the Forbearance Agreement.   Specifically, The La Casa and Latin Quarter Debtors' minority shareholders, Thomas Spinner and James Sorkin consented to the Forbearance Agreement in accordance with the terms of the respective Operating Agreements for Debtors La Casa and Latin Quarter, as they had done with the original Credit Agreement and Loans from M&T in 2014. (*See* Para. 31, *supra*.) [8]

45.   The Forbearance Agreement required, among other things, that the following steps to be taken with respect to our restructure:

> (i.)     That the sum of $250,000 that the bank had required me to invest into Garces Group in early 2017, as a quid pro quo during our Forbearance Discussions, would be treated as equity and

---

[8] With respect to these new borrowers, I owned and still own 100% of all but one of the additional borrowers, BPNY Holdings, of which I own 88.57%.   Therefore, with respect to BPNY Holdings, which was part of the ownership structure of Amada New York, we obtained executed consents to the Forbearance Agreement from the minority partners there, Jim Sorkin, 1.33%, and Tom Spinner, 10.0%.

> subordinated to all creditors;
>
> (ii.)    That I would be required to invest another $50,000 in equity into the company by October 31, 2017;
>
> (iii.)    The Garces Group would be required to hire a CRO by June 30, 2017 with authority over financial and operational issues.  (We had already hired our own CRO, prior to M&T making this demand.);
>
> (iv.)    Garces Group would bring on an investment banker by July 31, 2017 to work on a refinance or sale transaction for the assets of the Group; and
>
> (v.)    That we would sell a dormant liquor license held by a long closed entity known as GRGDilworth (not a debtor here) and deliver the proceeds of same to the bank.

46.    On our own, we took the following actions in connection with our out of court restructuring:  First, we went through two rounds of reductions in force.  In June 2017, we let go 16 people, in addition to reducing certain salaries, saving approximately $1.3 million in annualized payroll expense.  In the first quarter of 2018, we implemented further reductions of 7 positions, saving another $500,000 annualized.

47.    Second, and also in June 2017, we hired John Fioretti, a seasoned restructuring professional, to serve as interim CEO and CRO in order to steer us through the restructure.  John has negotiated landlord redactions, revamped our accounting and financial group, managed our external professionals, negotiated with parties interested in acquiring our assets, and made numerous beneficial changes throughout the entire Garces Group since that time.

48.    Third, we recruited Chris Kline to join Garces as Chief Financial Officer. Prior to joining Garces, Chris was Director of Finance of STARR Catering, overseeing the Finance/Accounting department.   Chris has over 20 years of experience in the hospitality industry and working along with John, has been a key part of the restructuring team

49.    Fourth, we renegotiated substantial rent discounts on two of our troubled restaurants:  Amada, NY and Moorestown, NJ leases, but even at substantially reduced rents,

these entities were unable to sustain themselves.    As discussed above, and at John's recommendation and guidance, we closed New York in March 2018.

50.    Fifth, in the summer of 2017, we replaced our primary food vendor, Julius Silvert, Inc., a major shareholder of which is James Sorkin, an insider of a number of the Debtors.  Based upon the financial stresses we were suffering, immediately following execution of the Forbearance Agreement we undertook extensive market research on our food suppliers and purchases, which led us to the conclusion that we were being overcharged by more than 10% by the company.  Over the years, I estimate some $120 million in purchases of goods and services from Sorkin's company.  This change has resulted in substantial savings.  We also replaced other critical vendors, such as produce, which recognized further cost savings.

### III.    FINANCIAL RESULTS/PERFORMANCE/VENDOR RELATIONSHIPS

51.    The Garces Group had $38.6 Million in revenues in 2017, with an EBITDAR loss of $672,000, and an overall net loss of $2.6 million.  However, of the EBITDAR loss of $672,000, $1.28 million was extraordinary restructuring costs including professional and accounting fees.  Absent these extraordinary restructuring costs, the Garces Group of companies had positive 2017 EBITDA of $608,000.

52.    For 2018, we are projecting revenues of $32.7 million with positive EBITDA of $2.3 million, and positive net operating income of $1.4 million.

53.    Accounts payable for the group of companies stand at $7.9 million, although approximately $4.4 million of that is concentrated with three parties, one of which is insider Julius Silvert, owed an alleged $3.2 million.

54.    Our liquidity problems brought about by the closures of Revel and the failure of Amada, NY, as described above, created the significant pressures which caused our payables to

balloon and our invoice days outstanding to climb.  Garces Group entities, including these Debtors, are currently defendants in at least five (5) non-insider collection actions commenced by discontinued vendors and landlords, as follows:

- 783 Manhattan Fruit Exchange Inc. d/b/a Manhattan Fruit Exchange v. GRGNY1, LLC d/b/a Amada NY, No. CV-027373-17/NY (Civil Court of the City of New York, New York County);

- The Happy Huckster Corp., d/b/a The FarmArt v. Latin Quarter Concepts, LLC d/b/a Tinto Restaurant; LaCuidad, LLC d/b/a Distrito; GRGBookies, LLC d/b/a The Olde Bar; UrbanFarm LLC, GR300, LLC d/b/a Volver; Vwone, LLC d/b/a Garces Trading Company; Garces Catering 300, LLC d/b/a Garces Catering, No. 170901303 (Philadelphia County Court of Common Pleas);

- J. Ambrogi Food Distribution, Inc. v. Garces Restaurant Group, Inc. and Jose Garces, No. 2:18-cv-00239-CDJ (E.D. Pa.);

- First Choice Food Distributors v. Garces Restaurant Group Inc., Jose Garces, and Christian Garces, 2:18-cv-00926-CDJ (E.D. Pa.);

- Jemal's Blagden Alley, LLC vs. Garces Restaurant Group, Inc., 2017 CA 008063 (District of Columbia, Superior Court)

55.    Notwithstanding the foregoing, the Garces Group has productive and evolving relationships with its critical vendors, despite stretched pre-petition payments by the Garces Group because of our tight liquidity.

### IV.    THE PREPETITION SALE/INVESTMENT BANKER PROCESS

56.    On August 25, 2017, we retained CohnReznick Capital Market Securities, LLC ("CRC"), as our exclusive investment banker to market a transaction for the Debtors, in

particular, a going concern sale of assets in order to maximize value and preserve local Philadelphia and New Jersey jobs, for the benefit of all stakeholders.

57.     Since its retention, CRC has undertaken a broad range of activities to market the assets, including, without limitation, email correspondence, telephone conferences, on-site meetings, and numerous tours at the Philadelphia headquarters and the various restaurant locations with prospective purchasers.

58.     Immediately after its pre-petition retention, CRC initiated an extensive due diligence process to understand the Debtors' businesses, organize due diligence materials, to develop collateral marketing materials, and to implement CRC's marketing process.  CRC created a secure electronic data room and populated it with extensive information concerning the Debtors' finances and operations in order to assist prospective purchasers with due diligence.

59.     Thereafter, CRC identified and contacted approximately 142 parties, including:

    (i.)        25 Potential Strategic Buyers
    (ii.)       26 Financial Buyers with a focus on Hospitality
    (iii.)      52 Special Situations Financials; and
    (iv.)       39 Potential New Asset Backed Lenders

60.     The marketing process began the week of October 17, 2017 with an email blast to 200 of CohnReznick, LLP ("CR") partners.  Several additional parties were subsequently added to the investor universe by CR's Hospitality Industry Specialists.

61.     As a result of this process, 46 prospective purchasers executed non-disclosure agreements ("NDA").  Upon the execution of an NDA, CRC provided these prospective purchasers with a 60-page Confidential Information Memoranda and access to the online data room.

62.     From these 46 parties, ten (10) conducted a series of onsite meetings, followed by

17

3933147

six (6) of them ultimately sending Letters of Intent ("LOI") for a transaction.

63.   I met repeatedly with all six of these "finalist" parties, exploring a transaction that would reposition the business for the benefit of all stakeholders.

64.   From these six (6) initial finalists, two parties emerged as potentially the most effective global solution, considering all stakeholders, and after several weeks of negotiations and mutual due diligence, one acquirer emerged in late January as, in our opinion at the time, ultimately the best potential partner to acquire the assets of Garces Group.  That party is Ballard Brands Acquisition LLC ("Ballard Brands").

65.   Ballard Brands is a privately-held restaurant and hospitality company owned by brothers Paul, Scott and Steve Ballard and headquartered in Covington, Louisiana.  Although the company was formed in December 2012, the brothers have had a long history of successful food and restaurant businesses and brands.  In 1995, Paul Ballard and his wife, Torry, opened their first PJ's Coffee franchise in Covington, LA, following that with a second store in Baton Rouge.  Meanwhile, brother Scott Ballard opened a Smoothie King franchise in Athens, Ga. and eventually opened eight more stores in the Raleigh/Durham/Chapel Hill region of North Carolina with his brother, Steven.  In 2008, the Ballard brothers purchased the entire PJ's Coffee franchise, with Scott Ballard serving as president and CEO.  Under Ballard leadership, PJ's achieved nearly 200 percent growth each year during the next four years, adding 63 locations and partnering with well-known companies such as Royal Sonesta, Waldorf Astoria, Windsor Court, New Orleans Convention Center, Rouses, Winn Dixie, Walmart and Ruth's Chris Steak House.  Ballard coffee has been served aboard Air Force One and in the White House.

66.   Besides PJ's Coffee of New Orleans, the company's restaurant portfolio includes fast casual retail brands WOW Café, The Original City Diner, and Boardhouse Serious

Sandwiches. These brands collectively total some 150 locations in both traditional and non-traditional models. The Ballard brothers also operate the Ole Saint Kitchen & Tap restaurant in New Orleans's historic French Quarter. Like PJ's coffee, Wow Café and Wingery also grew exponentially under Ballard stewardship. Through a partnership with Sodexo, Wow Café established a 90-location deal on college and university campuses across the country. In March of 2017, the A. B. Freeman School of Business at Tulane honored the Ballards with its 2017 Outstanding Family Enterprise Award which recognizes family-owned companies that combine business acumen and success with service to the community.

67.    Unfortunately, at the same time that Ballard Brands was sending us its LOI to purchase the assets for substantially more dollars than are currently being offered, two of our minority shareholders, James Sorkin and Thomas Spinner began commencing litigations against us, making all kinds of scurrilous allegations, including "fraud" and "Ponzi Scheme." As a direct result of that, the Ballards advised us that they were not interested in buying a litigation, and that they would need to have a forum to buy the assets "free and clear" of claims and encumbrances.

### V.    PLAN FOR THESE CHAPTER 11 PROCEEDINGS – THE FUTURE

68.    Two "stalking horse" Asset Purchase Agreements for the assets of these Debtors are currently being circulated and in the process of being negotiated: one with Ballard Brands, and a second with another one of the six (6) finalists referenced above. In addition, CRC has had recent discussions with another of the finalists – a large multinational corporation – that has expressed a strong renewed interest in participating in a transaction under a Section 363 free and clear sale.

69.    The Debtors expect to promptly finalize a stalking horse agreement with either the Ballard Brands or another one of these parties, for presentation to the Court for review and

19

approval.  Given the extensive interest and the extensive amounts of due diligence completed by all six (6) finalists over a lengthy pre-petition process, I am confident that whether it is the Ballard Brands or one of the other finalists, there is a well-financed purchaser interested in the assets and the brand, that will have the financial support to be able to address the bank debt, make a distribution to creditors, and via an asset acquisition, re-instill the customer confidence necessary to take the Garces Group and brand to the next level.

70.    Simultaneously with filing the Chapter 11 petitions herein, CRC is electronically notifying each of the 100 potential investor and lender universe with a one page executive summary, requesting that they re-engage as a part of an expedited sale process under §363.  CRC will also make more direct contact immediately with each of the finalists who have not yet been contacted.  CRC's retention by the Debtors to provide investment banking services post-petition is pending and subject to court review and approval.

## VI.    INSIDER LITIGATION

71.    Two insiders of the Debtors, Spinner Family Holdings, which is Tom Spinner's family investment vehicle ("SFH") and Jim Sorkin have engaged in a scorched earth litigation approach with us in order to wrest the highest value for themselves out of any asset sale transaction, to the detriment of all other creditors and stakeholders.  On January 30, 2018, SFH filed suit in the Superior Court of New Jersey, Monmouth County, against three Garces entities, claiming that one of his equity investments in Garces, specifically in Amada, New York, was guaranteed by three other Garces entities, i.e., one of the Debtor's herein, GRGAC4 LLC, as well as GRG CHUBB1 LLC and GRG2401 LLC.  In other words, Spinner was contending that an equity investment in one entity should be treated at the debt level at the Debtor plus two other

20

entities[9].  Furthermore, upon information and belief, the alleged signed guaranty which Mr.

Spinner claims forms the basis of his lawsuit, simply does not exist, although nowhere in that

lawsuit is that fact stated.

72.     On April 2, 2018, Spinner/SFH amended the above complaint, adding a count

seeking an emergency TRO to stop a draw on a letter of credit that SFH, as his equity

investment, had put up as a security deposit for the Amada New York Landlord.  In this amended

complaint, SFH included what the Philadelphia press has referred to as "over the top" allegations

about the operations of Garces Group including using the word "fraud" and calling the entire

enterprise a "Ponzi scheme." (*See* Philly Mag, Exhibit D hereto.)

73.     The TRO was presented to the Monmouth County Superior Court by Mr. Spinner,

without notice to me or to the Defendants, including the AC4 Debtor herein.  Judge Linda Grasso

Jones denied the *ex parte* TRO request, and scheduled SFH's "emergency" preliminary

injunction hearing for June 18, 2018, some 10 weeks following the date on which the TRO

request was presented.  A copy of the Court's decision is annexed hereto as **Exhibit F.**

74.     While this was going on, the interested asset purchasers with whom we were

negotiating proposed stalking horse agreements, made it clear that they did not want to buy into

the antics of our minority shareholders.  As a result, while we attempted to throw significant

amounts of asset sale purchase price dollars at the minority shareholders in return for their

consent to a transaction, they continued to raise one claim after another, raising their claims in

not one, but rather in multiple, separately filed litigations, in different states and different courts,

causing extensive damage to the brand and frankly to the prospective asset buyers' proposed

purchase price.

---

[9] I have been referred to Section 510(b) of the Bankruptcy Code.

3933147

75.     On April 16, 2018, insider Jim Sorkin's company, Julius Silvert, Inc., also sued Garces Restaurant Group, Inc. and others on an $800,000 note that was given by GRG, Inc. in settlement of obligations owed by Debtors, La Casa as well as Latin Quarter plus non-debtor Garces Events.  Like Thomas Spinner and his SFH, Julius Silvert, Inc. also use the word "fraud" in its complaint.

76.     Last Thursday, April 26, 2018, at a meeting of the members of the Debtors La Casa and Latin Quarter, Mr. Sorkin's counsel announced that he would once again be running into court in Philadelphia, again claiming fraud.  On Monday, April 30, 2018, both he and Spinner did this, the fourth litigation filed by the same two minority investors within three months, a litigation once again picked up by the press and causing further brand damage.

77.     The Debtors cannot handle the continued brand damage that will be effected by continued litigation from our insider vendors and minority shareholders.  Although we were planning to await receipt of a signed stalking horse contract, it is necessary to file these petitions now in order to obtain the benefit of the automatic stay against any further actions by the insiders against these Debtors.

78.     Despite extensive efforts to stay out of the Bankruptcy Court, any restructuring outside of a bankruptcy proceeding is simply, impossible.  Not only because of the brand and valuation damage wrought by the insiders, but also because none of the asset bidders will move forward without the protections that a bankruptcy procedure can bring, and specifically the protections of a section 363 sale order.  And that is why the Garces Group entities are here seeking the assistance of the court – not only to preserve what I have built, but also to save the jobs of some 750 employees who rely on the Garces brand each and every day for their livelihood.

3933147

## VII.    SECTION 363 SALE

79.    As a result of the foregoing, we intend to move expeditiously towards approval of expedited bid procedures and auction, subject to higher and better offers, pursuant to section 363 of the bankruptcy code.  Given the extensive pre-petition sales process described above and the fact that those six interested parties all conducted extensive due diligence and are being invited back into the process, I do not believe that a delay will result in the participation of additional bidders who have not already been involved.

80.    As soon as we have a stalking horse contract in hand, we will present the bid procedures motion to the Court.

## VIII.    FIRST DAY MOTIONS

81.    To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed or are filing the following First Day Motions:

- Debtors' Motion For An Order Directing Joint Administration Of The Debtors' Chapter 11 Cases.
- Application For Designation As Complex Chapter 11 Cases.
- Debtors' Motion For Interim And Final Orders Under Sections 361 And 363 Of The Bankruptcy Code Approving The Use Of Cash Collateral, Providing Adequate Protection And Setting A Final Hearing Pursuant To Bankruptcy Rule 4001.
- Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A) And 507(A)(4) (I) Authorizing But Not Directing The Debtors To Pay Prepetition Wages, Salaries, Compensation, Benefits And Reimbursable Business Expenses And Related Costs, And (II) Directing All Banks To Honor Checks For Payment Of Employee Obligations.
- Debtors' Motion For An Order (I) Authorizing The Debtors To Pay Certain Prepetition Claims Of Critical Vendors And (II) Granting Related Relief.

3933147

- Motion for and Order (I) Authorizing but not directing, the Debtors to Honor Certain Pre-petition Obligations to Customers and Continue, Renew, Replace, Modify, Implement or Terminate Customer Programs in the Ordinary Course of Business, and (II) Authorizing and Directing Financial Institutions to Honor all Related Checks and Electronic Payment Requests.

I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference and verify as true each of the factual statements set forth in the First Day Motions.  I believe that the relief requested by the First Day Motions is necessary to enable to the Debtors to preserve and maximize value and efficiently implement their restructuring efforts with minimal disruption and delay.

Dated: May 2, 2018

_____
Jose Garces

24

3933147