| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1**<br>**PORZIO, BROMBERG & NEWMAN, P.C.**<br>100 Southgate Parkway<br>P.O. Box 1997<br>Morristown, New Jersey 07962<br>(973) 538-4006<br>(973) 538-5146 Facsimile<br>Warren J. Martin Jr., Esq. (wjmartin@pbnlaw.com)<br>Kelly D. Curtin, Esq. (kdcurtin@pbnlaw.com)<br>Rachel A. Parisi, Esq. (raparisi@pbnlaw.com)<br>*Proposed Counsel to Debtors* | |
| In Re:<br><br>Garces Restaurant Group, Inc., d/b/a Garces Group, *et al.*,[1]<br><br>Debtors. | Case No.: 18-19054 (JNP)<br><br>(Jointly Administered)<br><br>Chapter: 11<br><br>**Hearing Date and Time:**<br>**May _____, 2018, at ___:___ __.m.** |

**DEBTORS' MOTION FOR AN ORDER APPROVING DEBTORS'
KEY EMPLOYEE INCENTIVE PROGRAM AND AUTHORIZING,
BUT NOT DIRECTING PAYMENTS THEREUNDER**

Garces Restaurant Group, Inc., d/b/a Garces Group., *et al.*, (the "Debtors"), submit this motion (the "Motion") for entry of an order approving the Debtors' key employee incentive program for certain employees (the "KEIP") and authorizing the payments contemplated thereunder. In support of this Motion, the Debtors rely on the Affidavit of Jose Garces in Support of the Debtors' Chapter 11 Petition And First Day Motions (the "Garces Affidavit") [Dkt.

---

[1] The Debtors in these cases and the last four digits of their employee identification numbers are: GRGAC1, LLC d/b/a Amada (7047); GRGAC2, LLC d/b/a Village Whiskey (7079); GRGAC3, LLC d/b/a Distrito Cantina (7109); GRGAC4, LLC (0542); Garces Restaurant Group, Inc. d/b/a Garces Group (0697); Latin Valley 2130, LLC; La Casa Culinary, LLC d/b/a Amada Restaurant (4127); Garces Catering 300, LLC d/b/a Garces Catering (3791); Latin Quarter Concepts, LLC d/b/a Tinto d/b/a Village Whiskey (0067); UrbanFarm, LLC d/b/a JG Domestic (3014); GR300, LLC d/b/a Volver (0347); GRG2401, LLC (7222); GRGChubb1, LLC (8350); GRGFC1, LLC (2040); GRGKC1, LLC; GRGWildwood, LLC (9683); and GRGNY2, LLC (0475).

3939735

No. 2][2] and the Certification of John Fioretti (the "Fioretti Certification") filed concurrently herewith, and respectfully represent and set forth as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought herein are sections 363(b) and 503(b) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4. On the May 2, 2018 (the "Petition Date"), the Debtors each filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court").

5. The Debtors continue to operate their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made and, as of the date of the filing of the Motion, no official committees have been appointed or designated.

6. A detailed description of the Debtors' business and the facts precipitating the filing of the Debtors' chapter 11 cases is set forth in the Garces Affidavit, which is incorporated by reference.

### A. The Debtors' Business

7. Since opening Amada as their first restaurant in 2005, the Debtors and related

---

[2] Docket numbers referenced herein shall refer to docket numbers in Case No. 18-19054 (JNP) unless otherwise stated.

entities have grown to over $40 million in revenue, approximately 750 employees, and operate in three business segments: catering, managed services, and owned restaurants. *See* Garces Affidavit at ¶¶5-7.

8. Most of the Debtors' general managers started in hourly or mid-level positions and were promoted from within. *See* Garces Affidavit at ¶7. Similarly, the vast majority of the Debtors' Chefs de Cuisine were internally promoted, and 60% of Senior Leadership team came to corporate via internal promotions from restaurant manager or Chefs de Cuisine positions. *See* Garces Affidavit at ¶7.

**B. Development of the Key Employee Incentive Program**

9. The Debtors' restructuring efforts began long before the Petition Date. In 2017, and pursuant to the Debtors negotiations with their lender, the Debtors hired an investment banker to work on a refinance or sale transaction for the assets. *See* Garces Affidavit at ¶45.

10. In June 2017, the Debtors hired John Fioretti, a seasoned restructuring professional, to serve as Chief Executive Officer. *See* Garces Affidavit at ¶47. The Debtors also recruited a Chief Financial Officer, Chris Kline, who has over 20 years of experience in the hospitality industry and previously served as the Director of Finance of STARR Catering tasked with overseeing the Finance/Accounting department. *See* Garces Affidavit at ¶47.

11. Together, the Debtors and their professionals reviewed the Debtors' anticipated needs throughout the restructuring and/or sale process and began to implement changes necessary to ensure a successful restructuring and/or sale process that maximizes recoveries for creditors. As part of that process, the Debtors went through two rounds of reductions in force, letting go of 16 people in June 2017, in addition to reducing certain salaries, saving approximately $1.3 million in annualized payroll expense, and letting go of 7 positions during

the first quarter of 2018, saving another $500,000 annualized. *See* Garces Affidavit at ¶46.

12.   The Debtors also considered ways to ensure the commitment of certain key personnel vital to the Debtors' operations. *See* Fioretti Certification at ¶4. In concert with their professionals, the Debtors designed a key employee incentive program (the "KEIP") with the goal of ensuring effective and stable management of the Debtors' operations in a cost-effective way in order to maximize the value of the Debtors assets for the benefit of all interested parties. *See* Fioretti Certification at ¶4. The KEIP was designed to reduce disruption to employees while improving morale and incentivizing job performance. *See* Fioretti Certification at ¶4. Moreover, the Debtors worked to ensure that the KEIP was competitive within the industry and that the incentives were appropriate to encourage loyalty by, among other things, reviewing similar incentive-based programs recently approved in chapter 11 cases. *See* Fioretti Certification at ¶4.

C.  **Description of the Key Employee Incentive Program**

13.   In the summer of 2017, the Debtors began to roll out the KEIP. The agreements relating to the KEIP are identical except for the names, dates and amounts of the lump sum bonuses (the "Bonuses"). *See* Fioretti Certification at ¶5. A redacted KEIP agreement is attached as **Exhibit A** to the Fioretti Certification.[3]

14.   Currently, there are thirty (30) employees, which are listed in **Exhibit B**[4] to the Fioretti Certification (the "Program Participants"), whose knowledge and skill have been and will continue to be essential to maximizing the value of the Debtors' estates. *See* Fioretti Certification at ¶6. The amounts of each of the Bonuses are also redacted, but the most frequently occurring Bonus amount is $5,000.

---

[3] **Exhibit A** has been redacted to remove names, dates and amounts.
[4] **Exhibit B** has been filed under seal to protect the privacy of the Program Participants and minimize detrimental impacts on employee morale.

15. Currently, there are thirty (30) employees (the "Program Participants") whose knowledge and skill have been and will continue to be essential to maximizing the value of the Debtors' estates. *See* Fioretti Certification at ¶6. A redacted list of Program Participants is attached as **Exhibit B** to the Fioretti Certification.[5] The amounts of each of the Bonuses are also redacted, but the most frequently occurring Bonus amount is $5,000.

16. The KEIP provides that the Program Participants would receive a Bonus if and after certain conditions are satisfied, primary of which is the closing of a financing or sale transaction. *See* Fioretti Certification at ¶7. The KEIP also required the Program Participants to sign the KEIP agreement, not resign employment or be terminated for misconduct or poor performance and must satisfactorily perform the tasks and responsibility that are assigned. *See* Fioretti Certification at **Exhibit A**.

17. The Program Participants are active employees of the Debtors—largely middle management and not high level executives—who are working hard every day to ensure the Debtors' success in these cases and ensure the hospitality level and food quality continue to excel. *See* Fioretti Certification at ¶8. Significantly, neither Mr. Garces nor John Fioretti are Program Participants. *See* Fioretti Certification at ¶8. A Chief Cultural Officer, Chief Financial Officer and three (3) Vice Presidents are Program Participants. *See* Fioretti Certification at ¶8. Notwithstanding their titles, the Chief Cultural Officer and Chief Financial Officer are the Debtors' second line of management below Mr. Garces and John Fioretti, and the Vice Presidents that are Program Participants are a third tier level of management. *See* Fioretti Certification at ¶8. Thus, although five of the Program Participants have senior titles, these individuals are not

---

[5] The names and financial incentives of the Program Participants are not included herein to protect the privacy of the Program Participants and minimize detrimental impacts on employee morale. An unredacted copy of Exhibit B will be provided to the Court and the U.S. Trustee.

persons in control of the Debtors. *See* Fioretti Certification at ¶8.

18. In addition to maintaining most of their normal responsibilities related to the Debtors' operations, the Program Participants already have, and will continue to, assume significantly greater responsibilities as a result of these chapter 11 cases. *See* Fioretti Certification at ¶9.

19. Payments made under the KEIP are necessary to demonstrate consistency and commitment to the Program Participants, ensure the Program Participants focus their efforts on the successful operations of the Debtors' businesses, to maximize the recoveries assets, and minimize operational expenses. *See* Fioretti Certification at ¶10. Without the incentives provided for in the KEIP, the Debtors likely would lose the Program Participants that are most essential to their efforts and difficult to replace. *See* Fioretti Certification at ¶10. The Debtors' ability to maintain their business operations, preserve the value of their assets, and maximize stakeholder recoveries through a successful and expedient restructuring process hinges on the Debtors' ability to incentivize and retain key employees during this critical period. *See* Fioretti Certification at ¶10. Accordingly, the Debtors approval of the KEIP to motivate key employees to advance the Debtors' business and restructuring goals during the pendency of these Cases. *See* Fioretti Certification at ¶10.

## RELIEF REQUESTED

20. By this Motion, the Debtors respectfully request entry of an order approving the KEIP and authorizing the payments thereunder.

## BASIS FOR RELIEF

21. Bankruptcy Code sections 1107(a) and 1108 authorize a debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." The

purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor-in-possession with "flexibility to engage in ordinary transactions" required to operate its business without oversight by its creditors or the court. *See, e.g., In re Roth Am., Inc.,* 975 F.2d 949, 952 (3rd Cr. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and other from dissipation of the estate's assets.") (quoting *U.S. ex rel. Harrison v. Estate of Deutscher* (*In re H&S Transp. Co.*), LL5 B.R. 592, 599 (M.D. Tenn. 1990)); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 7 8'7, 7 9 6 (Bankr. D. Del. 2007). Because the KEIP was developed pre-Petition Date as part of the Debtors' business plans, continuing to honor the KEIP is permitted under Bankruptcy Code Sections 363(c), 1107(a) and 1108. Notwithstanding, the Debtors file this Motion out of abundance of caution.

### A. The KEIP Is Not Subject To The Strict Restrictions Of Section 503(c)(1) Or (2) Of The Bankruptcy Code To The Extent The Program Participants Are Not Insiders.

22. Section 503(c)(1) of the Bankruptcy Code provides that there shall neither be allowed, nor paid "a transfer made to, or an obligation incurred for the benefit of, an *insider* of the debtor for the purpose of *inducing such person to remain* with the debtor's business" unless certain strict and detailed criteria is satisfied. 11 U.S.C. § 503(c)(1) (emphasis added). Similarly, section 503(c)(2) of the Bankruptcy Code, prohibits severance payments "to an insider of the debtor" absent strict criteria. 11 U.S.C. § 503(c)(2).[6] Both sections are largely inapplicable here to the extent the KEIP does not contemplate a transfer to (or an obligation for the benefit of) an insider.

23. Indeed, a plan for the benefit of non-insiders is frequently approved, even if it is a retention plan. *See In re Furniture Brands Int'l, Inc.*, Case No. 13-12329 (CSS) (Bankr. D. Del.

---

[6] The Debtors do not seek to make any severance payments in connection with this Motion.

7

Oct. 11, 2013) (approving a retention plan for non-insider employees); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KR) (Bankr. E.D. Va. Mar. 25, 2009) (approving a retention plan for non-insiders); *In re KB Toys, Inc.*, Case No. 08-13269 (KJ) (Bankr. D. Del. Jan. 6, 2009) (approving a retention plan for non-insider employees); *In re Mervyn's Holdings, LLC*, Case No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2009) (approving a retention plan for non-insiders); *see also In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. Oct. 21, 2008) (approving a retention plan for non-insiders).

24. The term "insider" is defined as including "if the debtor is a corporation—(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B). It also includes "affiliate, or insider of an affiliate as if such affiliate were the debtor" and "managing agent of the debtor." 11 U.S.C. § 101(31)(B). Courts have declined to find insider status where the scope of authority is limited. *See In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (employees not insiders because none of them had authority to implement company policy, did not report to board of directors and were subordinate to actual officers). Moreover, courts look passed titles and instead look to the employees' individual functions and roles. *See In re NMI Sys., Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995) (finding that vice president was not insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions."); s*ee In re Global Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of board, participated in corporate governance, attended board meetings or reported to board). Here, the

8

Program Participants do not take part in the overall management of the Debtors, do not direct or implement company policy and do not report to the Board of Directors. Therefore, they are not "insiders."

25.   Here, the Program Participants are largely middle management and not high level executives who are working hard every day to ensure the Debtors' success in these cases and ensure the hospitality level and food quality continue to excel.  *See* Fioretti Certification at ¶8.  For the majority of the Program Participants, it is clear that they are not insiders and that the KEIP is not prohibited by section 503(c)(1) or (2) of the Bankruptcy Code.  *See* Fioretti Certification at ¶8.  Moreover, although five (5) of the Program Participants have senior titles (a Chief Cultural Officer, Chief Financial Officer and three (3) Vice Presidents), these individuals are not persons in control of the Debtors.  *See* Fioretti Certification at ¶8.  Despite their titles, the Chief Cultural Officer and Chief Financial Officer are the Debtors' second line of management below the CEO and Mr. Garces.  *See* Fioretti Certification at ¶8.  Moreover, the Vice Presidents that are Program Participants are a third tier level of management.  *See* Fioretti Certification at ¶8.  Accordingly, even those persons should not be considered "insiders."

**B. Even If Some Of The Program Participants Were Insiders, The KEIP Is Still Not Subject To The Strict Restrictions Of Section 503(c)(1) Because It Is An Incentive Plan Instead Of A Retention Plan That Should Be Approved Under Section 503(c)(3).**

26.   Moreover, even if some of the Program Participants were insiders, the KEIP is still permissible because while possessing certain "retentive" elements, it is an incentive plan incorporating performance targets that the employees need to meet before a payout is earned, and not a retention plan (which are typically based solely on an employee remaining with the company).

9

3939735

      a. *The KEIP is an incentive plan.*

27. Although the Program Participants are encouraged to continue their employment with the Debtors, that effect does not convert the KEIP into a retention-driven plan. *See In re Global Home Prods.*, LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "The fact that ... all compensation has a retention element" did "not reduce the Court's conviction" that the debtors' primary goal in approving the incentive plans was "to create value by motivating performance"); *In re Patriot Coal Corp.*, 492 B.R. 518, 531 (Bankr. E.D. Mo. 2013) (citations and quotations omitted) (emphases added) ("Although a purported [incentive plan] may contain some retentive effect, that does not mean that the plan, overall, is retentive rather than incentivizing in nature.").

28. The Court has approved plans tied to certain targets. *See, e.g., In re Longview Power, LLC*, Case No. 13-12211 (BLS) (Bankr. D. Del. Dec. 19, 2013) (approving incentive payments to senior executives based upon the achievement of certain goals driven by the debtors' chapter 11 timeline and the desire to limit the costs of the cases); *In re Midway Games Inc.*, Case No. 09-10465 (KG) (Bankr. D. Del. Apr. 22, 2009) (approving an incentive plan for insiders based on the achievement of chapter 11 restructuring milestones); *In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. Feb. 10, 2009) (approving $1.75 million key employee incentive plan for senior managers); *In re AgFeed USA, LLC*, Case No. 13-11761 (BLS) (Bankr. D. Del. Aug. 29, 2013) (approving incentive payments to senior management based upon the success of the debtors' sale process); *In re Pope & Talbot, Inc.*, Case No. 07-11738 (CSS) (Bankr. D. Del. Apr. 23, 2008) (approving a modified plan based on sales proceeds performance).

29. Significantly, the KEIP provides that the Program Participants would receive a Bonus if and after certain conditions are satisfied, primary of which is the closing of a financing or sale transaction, which depends largely on the continued efforts of the Program Participants. *See* Fioretti Certification at ¶7. The KEIP also required the Program Participants to sign the KEIP agreement, not resign employment or be terminated for misconduct or poor performance and satisfactorily perform the tasks and responsibility that are assigned. *See* Fioretti Certification at **Exhibit A**. Accordingly, the KEIP is not simply rewarding the employees' staying power, it is incentivizing the Program Participants, while also minimizing retention problems, low morale and low productivity. Accordingly, to the extent the KEIP is found to benefit any insiders, it should still be approved under section 503(c)(3).

    b. *The KEIP Should Be Approved Under Section 503(c)(3).*

30. Section 503(c)(3) of the Bankruptcy Code requires that transfers or obligations outside the ordinary course of business to any person or entity, including officers, managers, or consultants hired post-petition, be "justified by the facts and circumstances of the case." Section 503(c) was added to the Bankruptcy Code in 2005 to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." A court "must examine a proposed [incentive plan] . . . and determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work." *In re Patriot Coal Corp.*, 492 B.R. 518, 531 (Bankr. E.D. Mo. 2013) (citations and quotations omitted). To determine whether a KEIP is justified by the facts and circumstances, courts use the business judgment test under Section 363(b)(1).

31. The standard for approving payments under section 503(c)(3) is essentially the same "business judgment" standard for approving similar transactions under section 363(b)(1) of

11

the Bankruptcy Code. *See, e.g., In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 804 (Bankr. D. Del. 2007) (holding that, because bonus plan's primary motivation was not retentive, section 503(c)(1) did not apply and business judgment standard was to be used to assess plan); *In re Global Home Prods., LLC*, 369 B.R. at 787 (same).

32.     Courts have routinely approved payments under these plans pursuant to section 363(b) of the Bankruptcy Code as an exercise of the Debtors' business judgment. Section 363(b)(1) of the Bankruptcy Code allows a debtor in possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing, in the exercise of the Debtors' business judgment. 11 U.S.C. § 363(b)(1); *see also, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (stating that under normal circumstances, courts will defer to debtor's judgment in using property under section 363(b) if there is legitimate business justification). Therefore, the estate's property may be used other than in the ordinary course of business if the debtor can show a "sound business purpose" for such use. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him [supports a] good business reason to grant the application."); *In re Del. Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991). If a debtor shows a valid business purpose, the court applies the "business judgment rule," a presumption "that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).

33.     Applying the business judgment rule in chapter 11 cases, courts have routinely permitted employee payments that are outside the normal course of business. *See, e.g., Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding*

*Corp.*), 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court's authorization of key employee compensation program, holding "[i]n determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); *In re Global Home Prods.*, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *see also In re Martin*, 91 F.3d at 395 (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)).

34. Granting the relief requested herein and approving the KEIP is necessary to maximize the value of the Debtors' estates and is appropriate under the circumstances. It also represents a sound business purpose and satisfies the business judgment rule. The Program Participants have worked hard to bring the Debtors to this point, but there remains a significant amount of work required in connection with the contemplated sale of the Debtors' assets. Given the recent filings and negative press, it is crucial that the Debtors maintain the loyalty of these key employees and incentivize them to deliver their best performance throughout these cases—particularly given that the loss or demoralization of any of the Program Participants at this critical juncture will likely reduce the value of the Debtors' assets and disrupt the sales process. The focus and attention that the Program Participants bring to their tasks as these chapter 11 cases proceed will have a meaningful impact on creditor recoveries in these cases and incentivizing their performance via the KEIP will maximize value for creditors.

## WAIVER OF MEMORANDUM OF LAW

35. Because the legal basis upon which the Debtors rely is incorporated herein and the Motion does not raise any novel issues of law, the Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013

1(a)(3).

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

36. The Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and a waiver of any stay of the order proposed herein, including under Bankruptcy Rules 4001(a)(3) and 6004(h).

## NO PRIOR REQUEST

37. No prior request for relief sought herein has been made to this Court or any other court.

## NOTICE

38. By separate application filed simultaneously herewith, the Debtors have requested that the Court shorten the notice period and enter an order shortening time for the hearing on the Motion.

39. The Debtors respectfully request they be authorized to provide notice pursuant to the Order Shortening Time Period, Setting Hearing and Limiting Notice entered by the Court for this Motion. The Debtors believe that such notice to such parties is reasonably calculated to inform creditors regarding the emergency relief that is being requested and is sufficient under the circumstances.

3939735

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request entry of the accompanying Order in the form annexed hereto, and for such other and further relief as is just and proper.

Dated: May 7, 2018

Respectfully submitted,

**PORZIO, BROMBERG & NEWMAN, P.C.**
*Proposed Counsel to the Debtors*


By: */s/ Kelly D. Curtin.*
     Kelly D. Curtin

3939735