**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| |
|---|
| In re:<br><br>GARCES RESTAURANT GROUP, INC., d/b/a/<br>GARCES GROUP, et al.,<br><br>                          Debtors. |

Case No. 18-19054 (JNP)
(Jointly Administered)

Chapter 11

Judge: Jerrold N. Poslusny, Jr.

## OPINION APPROVING THE FINAL FEE APPLICATION OF
## COHNREZNICK CAPITAL MARKETS SECURITIES, LLC

**JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge**

CohnReznick Capital Markets Securities, LLC ("CRC"), the Debtors' investment banker,

filed its first and final fee application for services rendered from May 2 through August 1, 2018,

and reimbursement of expenses (the "Fee Application"). The Fee Application seeks a fee of

$318,006 and $7,500 in expenses, for a total award of $325,506. The Official Committee of

Unsecured Creditors (the "Committee") and the United States Trustee (the "U.S. Trustee") oppose

the reasonableness of the Fee Application. M&T Bank ("M&T"), the Debtors' senior secured

lender, filed a limited objection, arguing there are insufficient funds to cover professionals' claims

and expenses. On November 1, 2018, the Court held an evidentiary hearing on the Fee Application,

where Jeffrey R. Manning, a managing director at CRC, testified. On December 20, 2018, the

Court gave an abbreviated oral decision and entered an order approving the Fee Application. This

Opinion supplements the oral decision.

## BACKGROUND

CRC provides a broad range of services including, accounting, consulting, and investment

banking services to financially distressed companies. In 2017, the Debtors and certain of their

affiliates retained CRC as their investment banker to assist with a recapitalization or a sale of their

assets. CRC received a $50,000 retainer. Pursuant to an engagement letter (the "Engagement Letter"), CRC agreed to analyze and evaluate the Debtors' finances and operations, identify and contact potential investors, prepare financial and marketing materials, conduct due diligence, and advise and coordinate with the Debtors through the closing process. In exchange, CRC agreed to further compensation based on, inter alia, the sale price of the Debtors' assets.

Through its prepetition efforts, CRC identified and contacted parties potentially interested in the Debtors' business and assets. It provided due diligence materials, developed collateral marketing materials, and sent email correspondence to over 200 potentially interested parties. Forty-six potential buyers executed non-disclosure agreements and received a sixty-page confidential memorandum and access to an online data room, containing information about the Debtors' finances and operations. Ten of these parties conducted on-site meetings and six sent the Debtors a proposed letter of intent. The Debtors ultimately focused on two parties that had proposed similar offers. Eventually Ballard Brands Acquisition, LLC ("Ballard"), emerged as the preferred bidder. Negotiations with Ballard later broke down allegedly due to litigation commenced by minority shareholders of certain of the Debtors. Ballard refused to complete a transaction without protections from claims and encumbrances. As a result, the parties could not reach an agreement.

Beginning May 2, each of the Debtors[1] filed a voluntary Chapter 11 petition. The Debtors applied to retain CRC under the terms of the Engagement Letter. The Committee and M&T

---

[1] GRGAC1, LLC d/b/a Amada; GRGAC2, LLC d/b/a Village Whiskey; GRGAC3, LLC d/b/a Distrito Cantina; GRGAC4, LLC; Garces Restaurant Group, Inc. d/b/a Garces Group; Latin Valley 2130, LLC; La Casa Culinary, LLC d/b/a Amada Restaurant; Garces Catering 300, LLC d/b/a Garces Catering; Latin Quarter Concepts, LLC d/b/a Tinto d/b/a Village Whiskey; UrbanFarm, LLC d/b/a JG Domestic; GR300, LLC d/b/a Volver; GRG2401, LLC; RGChubb1, LLC; GRGKC1, LLC; GRGWildwood, LLC; GRGNY2, LLC; GRGDC2, LLC d/b/a Latin Market; and GRGBookies, LLC.

opposed the retention application, raising issues over CRC's proposed fee formula and requesting

that any fee application be considered under section 330, not section 328. The Court held a hearing

on the retention application on June 1 (the "June 1 Hearing"), at which it expressed concerns about

insufficient funds to cover claims and expenses and what would be included as consideration to

calculate CRC's percentage fee. June 1 Hearing, 11:27:52-11:28:41. Nevertheless, the Court

determined that the fee arrangement requested was reasonable and that CRC would be entitled to

a $200,000 transaction fee plus a percentage fee as set forth in the Engagement Letter. The Court

also determined that in order to approve the retention, the Debtors and CRC would have to agree

to a retention order that: (a) specifies what is included as "Consideration," and (b) allows the Court

to determine fees based on the reasonableness standard under section 330. Id. at 11:27:08-

11:27:35. The parties then agreed upon and submitted a proposed order addressing the Court's

concerns, which was entered on June 11 (the "Retention Order" Dkt. No. 293). The Retention

Order states in part:

> 3. CRC shall file interim and final fee applications for allowance of
> its compensation and expenses in accordance with the procedures
> set forth in sections 330 and 331 of the Bankruptcy Code . . .
> provided, however, that the fee applications filed by CRC shall be
> subject to review only pursuant to the standards set forth in section
> 328(a) of the Bankruptcy Code, and shall not be subject to any other
> standard of review set forth in section 330 of the Bankruptcy Code.
>
> 4. Notwithstanding the preceding paragraph of this Order . . . the
> U.S. Trustee, the Official Committee of Unsecured Creditors and
> M&T Bank shall have the right to object to CRC's request(s) for
> interim and final compensation and reimbursement based on the
> reasonableness standard provided in section 330 of the Bankruptcy
> Code consistent with other investment banking fees earned during
> an expedited § 363 marketing process.

Retention Order ¶¶ 3-4 (emphasis added). The Retention Order also specifies what is included as

Consideration to calculate CRC's percentage fee. See id. ¶ 8.

The Debtors and Ballard resumed negotiations post-petition and on May 9, they reached an agreement and Ballard became the stalking horse bidder for the Debtors' asets. At the same time CRC continued its marketing campaign for the sale of assets. The post-petition marketing period was approximately six weeks. Mr. Manning testified that CRC aggressively marketed the Debtors' assets during that time. CRC's post-petition services included, electronic communications with more than 100 investors identified during the prepetition period, conference calls with parties interested in transacting with the Debtors prepetition, consolidating data on the Debtors' finances and operations for potential buyers, and reviewing bid procedures, pre-qualified bids and non-conforming bids. An auction sale was scheduled for June 26, only Ballard appeared. DW Partners, the other qualified bidder, withdrew its bid shortly before the start of the auction. Since no other bidder appeared at the auction, the Debtors, the Committee, M&T, and Ballard used the time to negotiate an agreement related to the sale whereby Ballard increased its cash offer from $2 million to $3.5 million, bringing the total Consideration to $4,612,042, and M&T consented to the sale. The Debtors, with the support of the Committee and M&T, sought approval of the sale and a related settlement at a hearing on July 9.

The Court made findings related to CRC's efforts to assist with the sale of assets:

> Mr. Manning . . . testified about the prepetition efforts that the debtors made and he made through his firm to market and sell the debtors' assets. He also spoke of renewed efforts taken after the Chapter 11 case was filed. Mr. Manning provided additional testimony related to efforts that he has taken since the bid procedures were approved. Those efforts include sending revised information to potential bidders and parties that expressed interest in purchasing the assets prior to bankruptcy case - cases being filed. Mr. Manning testified that 12 parties expressed interest in participating in the auction, four of which were new, in comparison to the prepetition parties that had expressed some level of interest. One party submitted a nonconforming bid which the parties negotiated for several days including over the weekend prior to the auction.

> Eventually that party, which is a group comprised of DW and Messrs. Lubert and Adler which I will now refer to as the DW Group, was accepted as a qualified bidder on Monday before the auction. However, the next morning, Tuesday, just before the auction was scheduled to begin, the DW Group withdrew its bid, leaving on the buyer as a qualified bidder.

Transcript of Oral Decision at 9-10 (July 10, 2018) (the "July 10 Transcript"). The Court added:

> [T]he debtors aggressively marketed themselves through the efforts of their investment banker in an effort to maximize their value. Although there ended up being no competing bids at the auction, it was not for the lack of effort on behalf [of] the debtors and Mr. Manning. The fact that there were a number of interested parties and that the DW Group was qualified as a competing bidder suggests that the buyer's offer was in effect the highest and best offer for the assets and that other parties realized that fact and decided not to make competing bids in light of that determination. Mr. Manning's summary of the marketing campaign and attempts to qualify other bidders, including working with the DW Group through the weekend before the auction to get them to the point of being a qualified bidder, shows that the assets were aggressively marketed in an active market place in order to assure that the estate would receive the maximum benefit possible. For almost a year combined between pre and post-petition efforts, the debtors marketed themselves and pursued a sale of their assets. Mr. Manning testified that although he hoped for a higher offer, the purchase price here is adequate value and that the purchase price is comparable or better than recent asset sales in other hospitality bankruptcy cases, especially when making adjustments for the relative sizes of the entities . . . .

Id. at 12. The Court approved the sale on July 11.

The Fee Application seeks a fee of $318,006 and $7,500 in expenses. The Engagement Letter specifies that CRC would receive a $200,000 transaction fee plus 2.5% of Consideration on the first $5 million upon the sale of the Debtors' assets. Engagement Letter ¶ 2(c). The Fee Application is broken down as follows:

| [Ballard] Cash Bid | $3,500,000 |
|---|---|
| AMEX Payout | $ 375,300 |
| KEY Employee Retention | $ 160,000 |
| RMA & Kimmel Center | $ 505,177 |
| Other Cure Costs | $ 71,565 |
| **Cash & Assumed Debt Sub-Total** | **$4,612,042** |
| [CRC's Fees] | |
| Minimum Transaction Fee | $ 200,000 |
| 2.5% on the first $5.0 million | $ 115,301 |
| **Transaction Fees** | $ 315,301 |
| Less 15% Credit | ($47,295) |
| Transaction Fee after Credit | $ 268,006 |
| Pre-Petition Retainer | $ 50,000 |
| **Investment Banking Fees** | **$ 318,006** |
| **Out-of-Pocket Expenses (capped)** | **$ 7,500** |
| **Total Fees & Expenses** | **$ 325,506** |

Fee Application, Ex. B (Dkt. No. 420).

## JURISDICTION

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O). Venue is proper under 28 U.S.C. § 1408.

## DISCUSSION

### A. Section 328(a) and Section 330(a)

Professional compensation is generally governed by two sections of the Bankruptcy Code. Section 328 allows a trustee to retain a professional "on any reasonable terms and conditions of employment, including . . . on a contingent fee basis." 11 U.S.C. § 328(a). Once approved, a court cannot alter the fee arrangement unless the "terms and conditions prove to have been improvident in light of developments not capable of being anticipated . . . ." Id. Section 330, on the other hand,

authorizes a court to award "reasonable compensation for actual, necessary services rendered . . . ." and "reimbursement for actual, necessary services." 11 U.S.C. § 330(a)(1)(A)-(B). Reasonableness is based on the nature, extent, and value of services, considering the time spent, rates charged, whether the services were necessary or beneficial to the estate, whether the services were performed in a reasonable time, the professional's skills and experience, and whether a fee request is commensurate with fees charged by similar professionals in non-bankruptcy cases. 11 U.S.C. § 330(a)(3)(A)–(F).

Each section affects the timing of review. Section 328 permits a debtor to seek court approval to determine the reasonableness of a fee arrangement <u>before</u> services are rendered. <u>See In re National Gypsum Co.</u>, 123 F.3d 861, 862-63 (5th Cir. 1997). Conversely, section 330 allows a court to review fees <u>after</u> services have been rendered. <u>See F.V. Steel and Wire Co. v. Houlihan Lokey Howard & Zukin Capital, L.P.</u>, 350 B.R. 835, 838-39 (Bankr. E.D. Wis. 2006); 11 U.S.C. § 330(a)(2). Thus, sections 328 and 330 are "mutually exclusive." <u>In re Smart World Techs., LLC</u>, 552 F.3d 228, 232 (2d Cir. 2009).

### B. Scope of Review

The parties disagree on which section governs the Fee Application. The Committee and the U.S. Trustee argue that consideration of the Fee Application is governed by section 330, while CRC argues section 328 applies. CRC asserts, that even if section 330 applies, the Retention Order contains a carve-out, whereby a reasonableness inquiry should be limited to whether the fee requested is "consistent with other investment banking fees earned during an expedited section 363 marketing process." <u>Retention Order</u> ¶ 4.

The parties' dispute stems from a hybrid review allowed in the Retention Order. Paragraph 3 provides that the Fee Application is "<u>subject to review only pursuant to the standards</u>

set forth in section 328(a) . . . and shall not be subject to any other standard of review set forth in section 330 . . . ." (Emphasis added.) But paragraph 4 allows the U.S. Trustee, the Committee, and M&T to oppose the Fee Application "based on the reasonableness standard provided in section 330 . . . consistent with other investment banking fees earned during an expedited § 363 marketing process." (Emphasis added.) This hybrid review is often referred to as the "Blackstone Protocol." See In re Relativity Fashion, LLC, 2016 WL 8607005, at *5-6 (Bankr. S.D.N.Y. 2016). The Blackstone Protocol permits the U.S. Trustee, or in some cases, other parties, to object to a fee application under section 330, even though a professional's fee is approved under section 328. See Id. at *6.

Because the Retention Order specifically allowed for the Committee, M&T and the U.S. Trustee to object to CRC's fees under section 330, the Court will review the Fee Application under the standards of section 330. However, that review will be subject to the agreed upon carve-out in paragraph 4 of the Retention Order - whether the fee requested is "consistent with other investment banking fees earned during an expedited section 363 marketing process." Retention Order ¶ 4.

i.    Consideration is Defined in the Retention Order

The U.S. Trustee and the Committee argue that CRC lacked any role in obtaining the $1.5 million of additional cash that Ballard offered after the auction failed to go forward. The Committee argues that CRC's fee should be limited to the $50,000 retainer. CRC states that the Engagement Letter allows it to receive a $200,000 transaction fee plus a 2.5% fee upon consummation of the sale of assets. The U.S. Trustee separately suggests the cash portion of the Consideration be limited to the original $2 million cash offered by Ballard because CRC allegedly had little or no role in obtaining the additional $1.5 million cash. CRC argues that the U.S. Trustee's suggestion is at odds with the Retention Order because Consideration is defined to

8

include "any cash." Therefore, the total consideration should be $4,612,042, not $3,112,042 ($4,612,042 minus $1,500,000).

The Engagement Letter outlined CRC's fee structure. CRC would be entitled to a $200,000 transaction fee plus 2.5% of the first $5 million of Consideration (which was subsequently defined in the Retention Order). The Court made specific findings related to CRC's efforts to maximize the value of the Debtors' assets which were discussed in its decision approving the sale. See July 10 Transcript at 9-10, 12. Mr. Manning also testified at the November 1 hearing about CRC's efforts to market the Debtors and obtain higher and better offers. As discussed above, CRC contacted over 100 potentially interested parties, met or held conference calls with many parties and worked with DW Partners to qualify its bid. Mr. Manning credibly testified that he texted and called Mr. Garces while the parties negotiated Ballard's increased cash offer after the auction failed to go forward in an effort to ensure that the overall deal went through. Therefore, the Court concludes that CRC performed as required and expected under the Engagement Letter and the Retention Order and is entitled to the full amount of the fee requested.

As to the U.S. Trustee's suggestion, to limit the cash portion of total Consideration would be contrary to the definition of "Consideration" in the Retention Order. The Retention Order broadly defines "Consideration" to include "any cash, assumed cure payments, assumed key employee payments, and assumed American Express loan debt, and does not include any assumption of gift cards/deposits and the assumption of any trade payables (such as post-petition trade liabilities)." Retention Order ¶ 8 (emphasis added). The language of the Retention Order was negotiated by the parties after the June 1 Hearing and it broadly defined the cash portion of Consideration.

The parties could have agreed or sought a Court ruling to more narrowly define "Consideration" and CRC's fee structure. For example, the parties could have limited the cash portion of Consideration to be $2 million unless increased at an auction, or to carve-out any cash increase by a successful bidder if the amount of cash after an auction failed to meet M&T's benchmark. But no such parameters were included. All the parties knew that M&T might not have agreed to a sale if the initial $2 million cash offer did not increase substantially, its counsel stated as much at several hearings. Nevertheless, the parties submitted an agreed order that defines Consideration to include "any cash." Accordingly, CRC's percentage fee will be measured by the total Consideration of $4,612,042. See Fee Application, Ex. B.

ii.    CRC's Fee is Reasonable

Turning to the reasonableness of the fee sought, CRC bears the burden of showing that it is reasonable. Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc., 50 F.3d 253, 261 (3d Cir. 1995). Failure to sustain the burden of proof may result in the denial of compensation. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 848 (3d Cir. 1994).

In support of the Fee Application, CRC provided evidence of fees awarded to investment bankers in the following cases: Madison Vineyard Holdings, LLC, a/k/a/ Jamieson Ranch Vineyards; In re Skymall, LLC, Case No. 15-bk-00679-bkm, Dkt. No. 240 (Bankr. D. Ari. 2015); In re NJOY, Inc., Case No. 16-12076-CSS, Dkt. No. 127 (Bankr. D. Del 2016); In re NephroGenex, Inc., 2017 WL 3189861, at *4 (Bankr. D. Del. 2017); In re Rupari Holding, Corp., Case No. 17-10793-KJC, Dkt. Nos. 64, 149, 359, and 407 (Bankr. D. Del. 2017); In re Folts Home, et al., Case No. 17-60139-6-dd, Dkt. Nos. 102 and 250 (Bankr. N.D.N.Y. 2017). Exhibit CRC-1. Mr. Manning testified that these cases are similar in size and complexity to the Debtors' cases. The objecting parties cross-examined Mr. Manning, but submitted no contrary evidence of their

10

own. The only evidence before the Court is the cases submitted in Ex. CRC-1, and Mr. Manning's testimony related to those cases.

Based on the evidence submitted, the Court finds that the $268,006 transaction fee (which includes CRC's voluntary 15% reduction) is consistent with fees charged in comparable cases. Beginning with retainers, the retainer in the cases cited ranged from $50,000 to $125,000 and averaged $75,000. CRC's retainer was $50,000, at the bottom range of retainer fees and below the average retainer of the cases cited. Accordingly, the retainer is reasonable.

Next, the transaction fees requested in the cases cited ranged from $200,000 to $650,750.[2] The total consideration in the cases cited ranged from $1.9 million to $38 million, with a marketing period of three to six months.[3] The transaction fees requested as a percentage of the total consideration ranged from 1.5% to 10.5%, and averaged 5.54%. Here, the $268,006 transaction fee is 5.81% of the total Consideration of about $4.6 million. The transaction fee is within the range of the cases cited, and the average is reasonable, although slightly higher than that of the cases cited. The higher percentage fee in these cases is fairly attributed to the Debtors' shorter marketing period than in other cases and the need to expedite a sale process while preserving the best transaction value. It could also be attributed to the fact that the sale price was at the lower end of the range, and in the Court's experience, lower sale prices result in higher percentage fees. For these reasons, the $268,006 transaction fee is reasonable.

---

[2] The transaction fees in these cases are a flat fee, percentage fee, or combination of the two.
[3] The Court takes judicial notice of documents that were filed in the cases included in Ex. CRC-1. See United States ex rel. Geisler v. Walters, 510 F.2d 887, 890 n.4 (3d Cir. 1975) (courts may take judicial notice of a document filed in another court).

### C. Alternative Basis for Granting the Fee Application

The U.S. Trustee and the Committee urge the Court to apply all of the factors under section 330 to determine the reasonableness of CRC's fee. Even if the carve-out in paragraph 4 of the Retention Order did not apply, CRC has demonstrated that its fee request is reasonable.

The "reasonableness analysis under section 330(a) is not an application of a strict formula." In re Residential Capital, LLC, 504 B.R. 358, 366 (Bankr. S.D.N.Y 2016). An investment banker's "main compensation is through transaction fees." Relativity Fashion, 2016 WL 8607005, at *3. "Transaction fees are not unique to bankruptcy. It has long been the practice of investment bankers to charge for their services in this exact same way outside of bankruptcy." Id. "Transaction fees are part of the standard, negotiated, base compensation for the investment banker" and they "are independent of the amount of time it takes to complete the transaction, the involvement of other people, et cetera." Id. at *3, 4. Because transaction fees are contingent upon the consummation of a transaction, some "factors do not apply, such as time spent or the rates charged." In re XO Commc'ns, Inc., 398 B.R. 106, 113 (Bankr. S.D.N.Y. 2008) (quoting In re Intelogic Trace, Inc., 188 B.R. 557, 559 (Bankr. W.D. Tex. 1995)) (footnote omitted) (internal quotation marks omitted). See also In re Iron Horse Bicycle Co., 2010 WL 474560, at *7 (Bankr. E.D.N.Y. 2010) ("[R]easonableness of a chapter 11 professional's fee need not always consider hours worked or billing rates.").[4]

Relevant factors when determining the reasonableness of a transaction fee include: (i) whether the services rendered were necessary and beneficial to the estate, and (ii) a market-

---

[4] Examples of cases where courts have reviewed transaction fees include: In re HNRC Dissolution Co., 340 B.R. 818, 821 (Bankr. E.D. Ky. 2006); Howard v. High River Ltd. P'ship, 369 B.R. 111, 115 (Bankr. S.D.N.Y. 2007); In re Santa Fe Holding Co., 2009 WL 4041898 (Bankr. M.D. Tenn. 2009); In re Uni-Marts, LLC, 2010 WL 1347640, at *2 (Bankr. D. Del. 2010); In re Texas Baseball Rangers Partners, 2011 WL1323777, at *4-8 (Bankr. N.D. Tex. 2011).

12

comparison of fees charged for similar services in non-bankruptcy cases. See XO Commc'ns, 398

B.R. at 113. A benefit analysis is a significant factor and of relevance because courts cannot award

compensation for services not beneficial to the estate or not "necessary to the administration of the

case." 11 U.S.C. § 330(a)(4). A market-comparison analysis is consistent with Third Circuit case

law, which favors a market-driven approach. See Zolfo, Cooper, 50 F.3d at 258 (Section "330

presents a market-driven approach . . . in which the cost of comparable services is the most

important of the listed factors, the others being the nature, extent, and value of the services.")

(quoting In re Busy Beaver, 19 F.3d at 849, 852) (internal quotation marks omitted).

Utilizing a benefit and market-comparison analysis, the court in In re UDC Homes, Inc.,

203 B.R. 218, 222-23 (Bankr. D. Del. 1997), reviewed a comparative data of over thirty domestic

transactions of similar cases in a five-year period, and concluded that a $2.71 million transaction

fee, measured by the transaction value of a stock purchase agreement or a total accreted value of

securities, was reasonable and consistent with average fees in comparably-sized cases. The court

also found that the services rendered were beneficial to the estate. The court ignored the time spent

and rates charged in assessing the reasonableness of the transaction fee given that it is earned upon

the completion of a transaction. See id.

Other courts have reached the same conclusion. In Interlogic Trace, 188 B.R. 557, the court

stated, "[t]he 'hours worked times a reasonable hourly rate' formula was constructed in the context

of attorneys' fees, and offers little assistance in the context of" a transaction fee. Id. at 560. The

court in Residential Capital stated that a transaction fee "should not depend on the amount of time

spent if the marketplace does not concern itself with that metric." Residential Capital, 504 B.R. at

371. XO Commc'ns shared a similar view, noting that "[u]nder a section 330(a) examination, the

time spent may shed little light on the actual value that a financial advisor brought to a transaction,

it is more the financial advisor's access to market opportunities and the results it achieved that warrant its compensation." XO Commc'ns, 398 B.R. at 113 n.9. In addition, the actual value a financial professional brought to a transaction may be measured by efforts reasonably expended to attain a result or preserve value for the estate. See, e.g., In re XO Commc'ns, 323 B.R. 330, 341 (Bankr. S.D.N.Y. 2005) ("[A]n unsuccessful outcome does not mandate a decision denying compensation" if efforts expended were necessary and beneficial to the estate. (citations omitted)).

i.    Benefit Analysis

The Committee argues that CRC should be deprived of further fees because CRC's services provided minimal, if any, benefit to the estate, and that CRC did not identify Ballard or provide competing bids on auction day. The Court, however, finds that CRC's services were necessary and beneficial to the estate as discussed above. Moreover, the fact that CRC did not identify Ballard is not and should not be a bar to the fee requested. The Engagement Letter includes a provision that limits CRC's fee for parties identified by the Debtors. Ballard was not identified as such a party, although another party was. The fact that the Debtors listed one party, but decided not to list Ballard, suggests the Debtors were aware of this provision and made a conscious decision, for whatever reason, not to include Ballard. Furthermore, to limit a benefit analysis to the argument advanced by the Committee is an improper way to examine the nature, extent, and value of services rendered. See Relativity Fashion, 2016 WL 8607005, at *10. As part of a benefit analysis, consideration must also be given to efforts expended for the benefit of the estate.

CRC's efforts further reduced a burden on the Debtors by providing experience and expertise on the sale of distressed assets, and immediate access to market participants. CRC's efforts led to the Debtors' sale being exposed to more than 100 potentially interested parties, many of whom expressed interest in acquiring the Debtors' assets. That bidders did not appear on auction

day, due to no fault of CRC, or CRC did not locate Ballard, is insufficient grounds to reduce the fee requested. For these reasons, the Court concludes that CRC services and efforts were necessary and beneficial to the Debtors.

ii.    Time Spent

The U.S. Trustee and the Committee argue that CRC's fee should be determined by the time CRC spent on the sale. The Retention Order required CRC to keep contemporaneous time records in quarter-hour (0.25) increments.[5] See Retention Order ¶ 5. "[I]t is appropriate, but not required, for a bankruptcy court to use a lodestar analysis to review an investment bank's fees for reasonableness." In re Citation Corp., 493 F.3d 1313, 1320 (11th Cir. 2007) (emphasis added). Therefore, the Court will also review the Fee Application under the imputed hourly rate.

Mr. Manning testified that CRC invested over 495 hours on these cases. The Committee and the U.S. Trustee argue that the time records CRC submitted properly document only about 250 hours. CRC tracked hours spent in meetings or on telephone calls through its Outlook calendar and submitted that report with its certification of Mr. Manning in reply to the objections to the Fee Application. Dkt. No. 463. The remaining hours were calculated based on estimates for emails received and sent. Mr. Manning testified that CRC billed 0.1 hour for each of the approximately 1,800 emails received and a 0.25 hour for each of 254 emails sent. There was no documentation related to those emails other than a statement of the number of emails received and sent.

Assuming only the 250 hours of time documented, CRC's imputed hourly rate is reasonable. The Court calculated the hourly rate in the cases cited in Ex. CRC-1 by dividing the transaction fee received by time spent in each case. The hourly rate in those cases ranged from

---

[5] The parties agreed to modify the requirements under the Bankruptcy Rules, Local Rules, and the Trustee Guidelines

$709 to $1,152, and averaged $1,026. CRC's fee request of $268,006 divided by 250 hours, results in an hourly rate of $1,072, well within the range of average rates and quite close to the average of those rates. Therefore, even if the Court were persuaded (a) to examine fees only on an hourly basis, and (b) that CRC should only be compensated for 250 hours of work, the fee requested is reasonable on an hourly basis.

### D. Reimbursement of Expenses

Finally, CRC seeks $7,500 in reimbursement expenses. This amount is not opposed, is reasonable, and therefore it will be allowed.

### CONCLUSION

For the foregoing reasons, the Court approves a fee of $318,006[6] and $7,500 in expenses, for a total award of $325,506. CRC shall apply the $50,000 retainer to the total award and the Debtors are directed and authorized to pay the remaining fee of $268,006 and $7,500 in expenses for a total payment of $275,506.

Dated: January 11, 2019

JERROLD N. POSLUSNY, J.R.
U.S. BANKRUPTCY COURT JUDGE

---

[6] This amount includes the $50,000 retainer.